Thank you. My name is Tim Bechtold here representing the Bear Creek Council appellants. This is a case where the Forest Service is trying to fit a square peg into a round hole. And a panel of this court has previously sent a version of this project back to the Forest Service, back to the drawing board. The Forest Service prepares hundreds of legal timber sales every year, but I think this is not one of them. This sales an occupied grizzly bear habitat management situation, one habitat just on the north border of Yellowstone Park. What I'm going to address here today is first the application of the critical habitat standards to grizzly bears in their recovery zones, then the forest plant standard compliance, and then the issues surrounding the NEPA process and the contract, then finally the economic analysis. Counsel, I've had some trouble in trying to put down the opinion that was issued in your brief and to determine exactly what issues we can still consider. Some of them, I think, are foreclosed. Now, as I think about it, I think you could talk about the bears, you could talk about the bias from the contract, you can talk about the consultative process, and you can talk about the cumulative road density. And I suppose you could talk about an EIS if the things that in this subsequent finding by the agency made it clear that an EIS was required. But a lot of the things, I think, that are going through your brief are foreclosed. Foreclosed by the Registry of CAUTA? Yes. Yes. So the Registry of CAUTA argument is based upon that this is a different final agency action than the first final agency action. If this panel rules that a different final agency action is now foreclosed by Registry of CAUTA, then that would be true. However, the Ninth Circuit has not yet held that a distinct final agency action is barred by Registry of CAUTA. Well, it's, you know, it's like we could swim around in this stuff forever. It was sent back for the Forest Service to do a supplemental analysis, correct? So it comes up to the court once, and we had an agency action, and there were a lot of things that could be put in that kitchen sink. It comes up, we send it back for a specific thing. It seems to me that the specific reevaluation as another final agency action can come up for review. But you can't re-raise things that you either should have raised before or that you actually raised before. So that's, you know, we're trying to make like these lists of your claims and trying to figure them out. And it just seemed to me that if we stick to what they came back with, we can analyze that and do it under the normal criteria. But it just seems to me you can't have a second chance at what should have happened in the first action as well. And maybe I'm missing something, and you want to elaborate as to why all your claims somehow, you know, have a new life. I'm just having some trouble with that. I guess it's fundamentally, the fundamental argument is that this is a different final agency action. It's a different decision notice. It's a different finding of no significant impact. And I can find no authority in the Ninth Circuit that says a separate final agency action is barred by res judicata. The Headwaters case deals with one isolated final agency action that was sued on twice. The Western Radio case is the same story. It's one final agency action that was sued on twice. This is not that situation. This is a situation where it's a separate final agency action. But there's not special rules that apply in administrative appeals to res judicata, are there? Not for administrative appeals. It would be, I think, a new clarification by this Court to say that a final agency action, a separate final agency action could not be challenged based on res judicata grounds. Regardless, the things that I will argue today, that is, the grizzly bear situation, the NEPA compliance surrounding the contract and the economic analyses, I think, are not prevented in any case by res judicata. Let me ask, let's do the bears as an example, and then maybe I can understand it and we can have the government respond to that. But is the bear issue, it seems to me, isn't that one that could have been raised the first time around in the administrative appeal? Or is it a brand-new issue? Well, what the district court said, or our court said, is that the bear issue, what the district court said before was that there hadn't been an adequate analysis of the bear issue in light of the fact that there were sheep grazing close to it and sent it back for further consideration by the agency. On that specific issue. That's right. Right. Okay. And what I'm asking the court to do is to apply a new legal standard established in the Gifford Pinchot case from last year, in which you were a panel member. And the difference here is that I'm asking the court to consider the recovery zone situation in light of that new legal precedent. I'm sure you know the grizzly bears do not have designated critical habitat. They have recovery zones. And they have different management situation categories within those recovery zones. So the grizzly bear were listed on the Endangered Species Act before it was amended to include the critical habitat component. After the critical habitat component of the Endangered Species Act was included, the Fund for Animals asked the Fish and Wildlife Service to designate critical habitat for bears, and it refused. And that led to a lawsuit in which the Fish and Wildlife Service said that the critical habitat for bears would be redundant because habitat protection in recovery zones is comparable to habitat protection in the critical habitat. Now, the critical habitat, as the panel you run and Gifford Pinchot decide, is that the purpose of critical habitat is to set aside certain areas that are essential to survival and recovery of the species. So if the purposes of the recovery zones and the purposes of critical habitat are the same or redundant, then, of course, what Gifford Pinchot addressed was a regulation that concerned adverse modification of critical habitat and ultimately ruled that the regulation did not properly account for the goal of recovery of the species. And since the recovery zones are redundant with critical habitat, I'm asking this court to find that habitat modification in Management Situation 1 habitat within those recovery zones must also contribute to the recovery of grizzly bears. Now, agencies make a specific finding that not just that habitat modification won't jeopardize the existence of grizzly bears, but that it would actually contribute to the recovery since recovery is the goal of the Act, particularly in Management Situation 1 habitat, which is the agencies have defined as habitat that is key to the survival of the species. And, therefore, also in Management Situation 1 habitat, projects have to favor the needs of the grizzly bear. So in the Gallatin National Forest, and especially in the Management Area 13 designations, I think any habitat modification that the agencies plan to do has to be required to benefit the grizzly bear and to contribute to the recovery of the species. So this would be a new step for recovery zones in grizzly bears. It's a standard that the Forest Service and the Fish and Wildlife Service do not have to meet. At this point, they just simply have to find no jeopardy, and it will not harm the recovery of the species or not harm the existence of the species. They don't have to affirmatively, as this Court found with critical habitat, to contribute to the recovery of the species. So that's the step that I'm asking this Court to take, essentially establish a new level of commitment to recovery under the Species Act. So there's no determination in the record here that this project will contribute to the recovery of the grizzly bear, nor that it favors the needs of the grizzly bear. As I read the record, they say there may be some slight damage to the grizzly bears. They don't say that it's in equilibrium. At least that's the way I read the record, that there might be some slight damage. That's right. It may affect, not likely to adversely affect. But there's no finding that it will benefit and no finding that it will contribute to the recovery. The next thing I'd like to address is the forest plan standards. Now here, it's just simply a situation where there's a timber compartment that the Forest Service doesn't meet 30 percent old growth. And this is the- Was that part of the first round? I'm not hearing you. What did you say this issue is? Whether or not one timber compartment met old growth standards under this harvest plan. The harvest plan changed from the first version to this version. So there's a different amount of acreage and a different amount of forward feet. So the idea here is that, just as any other case, the agency has deference to interpret its own statutes, I mean, its own regulations, but not that they're plain, plainly inconsistent with the language of the regulation. And here, the regulation is pretty plain that it has to, a timber compartment has to have 30 percent old growth. And the Forest Service says it is entitled to deference to say that, to have an informal amendment that the forested acres is what counts, not total acres. Now, was the old growth issue up before the Part B board? For this timber compartment, it was not addressed. Say that again? This specific timber compartment was not addressed in the court before, in the case prior. Should you have raised it then, the old growth issue? Well, for this timber compartment, I'm not sure. I'm not sure what the harvest plan was for this timber compartment in the old timber sale. I guess what, if I look at the two issues that were sent back, the road densities and enough area to support the grizzly, how did that change the forest plan acreage? It didn't change the forest plan language, but it changed the configuration of the actual project. In terms of the redo? Right. So the project now encompasses a different amount of acres and a different amount of board feet. And I cannot tell you whether or not this same timber compartment, the harvest schedule from this compartment, for this project is the exact same as it was in the prior project. But if it was, then it should have been raised before. I mean, was it raised before? No, this specific argument was not raised before. But you haven't shown to us that the change in the acreage to be harvested makes a difference in the calculations of the percentage of old growth and that kind of thing, have you? That's not been shown? Not for this timber compartment, no. Then what do we do with that then? Simply affirm? I mean, if you can't tell us, I'm not sure how we're going to figure this out. Do you see what I'm saying? If we don't have, and let's just say it's slightly different, but what's the evidence that that difference has some material effect or somehow changes the administrative decision? Are you asking the race judicata question? Well, I'm asking both. I mean, either it's race judicata or if it's something new, what can you point to to show us that you think it's an arbitrary and capricious decision as to how it might have been reconfigured? Well, the simple matter is that if this project is enacted, the old growth requirements for this timber compartment will not be met. So it's a straight-up violation of the forest plan standard. If the trees that are scheduled to be harvested are harvested, they will not be a retention of 30 percent old growth within that timber compartment. Does that have a number? Yes, it does. It's 305. Thank you. The next point I want to address is the situation of the contract during the course of remand. In this case, after this court remanded the project back to the Forest Service, they failed to evaluate the consequences of terminating, suspending, or amending the contract that they had for the Derek Eager project in place at that time. First, the range of alternatives, I think, is flawed, because during their no-action alternative they did not include the consideration of terminating the contract. Now, the Forest Service says that considering cancellation of the contract was outside the scope of the decision. At the supplemental excerpts at 384. But I think that under the Alaska Wilderness and Tourism Association case and Teneke Springs, the Forest Service should have considered the consequences of total abandonment of the project. In other words, the regulations provide for the methodology for determining the cost of when you breach a contract, but the Forest Service didn't look through those consequences. And because they didn't make that determination, I don't think that they had an informed or meaningful consideration under those cases of what the no-action alternative actually encompassed. The contract biased the analysis, and the terms of the contract, after all, are described in the EA itself as the preferred alternative. And moreover, as this Court has also ruled in Metcalf, the mere appearance of the mere presence of an existing contract tends to bias it, the situation. And the analysis was probably influenced simply because the contract existed. The contract has some termination provisions, but not the elegant provisions required by the regulations under 356 CFR Part 223. So the Forest Service should have analyzed the possibility of breach in order to provide a real picture of what the no-action alternative should have been. And then finally, I'd like to reserve the final three minutes for rebuttal, and so I'll address anything that comes up. I just want to ask you one question. You don't, in your new briefing, you've kind of abandoned this analysis of cumulative density of the roads? No, we haven't brought that up in this. We haven't addressed that in this. You don't address it? No. May it please the Court. My name is Jennifer Scheller, and I represent the Forest Service and the Fish and Wildlife Service. This Court should affirm the district court's judgment because, in large part, Bear Creek's claims are barred as a result of preclusion principles from the prior litigation. And in any event, Bear Creek hasn't shown that the agencies did anything that was arbitrary, capricious, or contrary to law. I'd like to first discuss the preclusion issues, and then the issues that Mr. Bechtold discussed in his argument. Bear Creek has already challenged this timber sale once, as this Court is well aware of. And this Court remanded to the agency for further consideration of two discrete issues. The agency has done that. And upon further consideration of those issues as well as the entire record, it is concluded to, again, proceed with this timber sale. And because of that prior judgment, Bear Creek should be barred from bringing any claims that it either did bring and lost in that first suit or that it could have brought in that first lawsuit. And I understand the Court's frustration with trying to sort out all of these various claims. And the way I see it, for instance, Bear Creek can bring the contract claim, and they can bring any claim that's based on new facts, but facts that haven't changed from the first lawsuit. For instance, the old growth standard, that analysis has not changed. If you look in the record excerpts, page 101, this is Mr. Bechtold, Bear Creek's excerpts, that document is from 1999, and it lays out the breakdown between new and old growth. And the same issue was present in the first lawsuit. And likewise, the issue about grizzly bears and whether or not the forest plan requires the service to make sure that every single timber sale benefits the grizzly bear or improves their habitat, that issue also could have been raised back in 1999. They could have made the same argument based on the plan language. Likewise, their Endangered Species Act argument, where they argue that based on the Fish and Wildlife Service's explanation and fund for animals, that case was decided in 1995. They could have relied on that in the first lawsuit to argue that the agency should have done a critical habitat analysis on the grizzly bears. And in the remand in respect to the problems of the closeness of the project to the raising area for goats, I guess, it seems to me implicit in that is concern that if there is any, at least a decrease in the welfare of the grizzly bears, that that poses a problem. Well, as I read this Court's decision, it said that the agency had not provided a sufficient explanation for why it limited the analysis area for the grizzly bears to the area that it chose and excluded the neighboring sheep allotment, grazing allotment. And so Forest Service on remand looked at that issue and concluded that they should look at the effects of that neighboring allotment, and they did that. So certainly Mr. Bechtel would be free to bring any claims based on that new analysis that was done. But if he wanted to make the argument that the forest plan itself required each individual timber sale to improve grizzly habitat, that should have been brought in the first lawsuit. And I don't think that just remanding on one issue related to grizzly bears. But what I'm seeing here is an acknowledgment by the agency that it is at least marginally going to cause problems for the grizzly bear. Now, is that a proper reading of what I'm reading and all this stuff? Well, there is a lot of stuff there. And certainly the agency tried to structure the sale, for instance, to protect the whitebark pine that would be a grizzly food source. And the agency does not come to the conclusion that the sale would actually improve the habitat for the bears. But it also says that it meets the forest plan standards, that there is not a conflict between the sale and the needs of the bears, that this area where the sale is going to take place is not essentially essential habitat for the bears, that there is food sources there, but it's not such that it's they're really relying on that. What the agency tells us in terms of standard is that you've got to consider whether there's less foraging habitat, changes in hiding, increased potential for bear mortalities. Now, that's what really is at issue here, I think, is increase in mortalities. Right. That's certainly one of the things that's at issue. And what the agency said is, for instance, that bears are successful omnivores, and they prime their habitat includes all sorts of different successional stages for them to find different types of food sources. And so although this sale would certainly, for instance, decrease the old growth food sources, it would make room for other successional stages. What they're saying also is that the bears are likely to forage into areas where there are humans, and that's what's involved with the goat pasturing. So I don't think there's any doubt that there is going to be some slight increase in chances of mortality. And does that in itself mean that the findings and the action of the agency is arbitrary? Well, I think the answer to that question is twofold. I don't read the record as saying that, for instance, the bears absolutely would go into the neighboring sheep allotment. I think what the record says is that there's enough habitat available that they wouldn't be forced to do that. They wouldn't be forced to come into conflict with humans in that way. But also, I don't read there to be any requirement that the agency, as long as it makes the determination that the action is not likely to jeopardize the bears, that's all, for instance, the Endangered Species Act would require. Well, they say that there's slight jeopardy. That's what they really say. I don't think so. Not under the Endangered Species Act standard, and certainly Bear Creek has not made that argument in the briefing that the jeopardy analysis was invalid. Bear Creek's argument relates to critical habitat, which, of course, there is no designated critical habitat here for the bear. You know, let me just step back. Bears get mixed up in a lot of claims here. So as I understand your position, the argument as to the standard under the ESA and the Forest Plan standard, that could have been challenged before. So those sort of more generic challenges would be res judicata. That's right. But as to the redo for which this case was sent back, that particular decision can be challenged. It can be challenged, but it was not challenged. Okay. And that's my question, is what – I know the cumulative impacts wasn't challenged. The other thing that we sent it back for was to see whether the support – whether the chosen area was sufficient to evaluate the impacts on the grizzly bear. That's right, which would be the analysis area, which had excluded that sheep grazing allotment. Right. And Bear Creek has it challenged. Is that challenged as you read it on this appeal? No, Your Honor, it is not. As I understand you, you said you went back and you included it. That's right. We did include it, yes. But Bear Creek doesn't make any arguments either challenging the new analysis area that the agency used or it doesn't make any challenges that rely on the inclusion of that area. They're all these generic challenges to what does the forest plan mean, what does the Endangered Species Act mean with respect to the bears. So in other words, when the Forest Service goes back and kind of loops in this additional area, there's no challenge made to it didn't put in enough or whatever. Right. But then does that beg the question as to once you expand the area, do you have to then redo the impact of that area on the grizzly? I think they did. What I'm saying is that do you agree that that's part of the challenge that can be determined by the court? Certainly if Bear Creek had argued that when you include that additional area, that that, under that analysis, the Forest Service could not, for instance, say that under the forest plan standards the use was compatible with the needs of the grizzly bear, then yes, they could certainly challenge something that was based on the inclusion of that new area in the agency. But they didn't. But they didn't. Okay. And I'd like to talk just a little bit more specifically about the NEPA challenge, the contract issue. This case is unlike Metcalf, where the agency had made a commitment to a particular result before it conducted its environmental analysis. Here the agency conducted its environmental analysis while it was, while Bear Creek's argument was winding its way through the courts. The agency entered into a contract, and then subsequently this court found that there were problems with the agency's analysis and remanded it back to the agency. The Forest Service has done all that Metcalf or Connor might require whenever it analyzed the, discussed the contract in the record and in the environmental assessment. It indicated that it was not bound by the terms of the contract. It felt that it could cancel the contract, and it also decided that there was no need to analyze, it wouldn't be helpful to analyze any of the economic effects of canceling the contract because the agency just couldn't predict what those might be. And also here, unlike in Metcalf, there's no indication that the agency's analysis was biased. Of course, in Metcalf, there was a statement that NIPS was constrained by the previous commitment that it had made to the Macaw tribe to support their whaling petition. Here, that's just simply not the case. The agency went back and looked at the same range of alternatives that it had in the 1999 decision and made a new decision based on that. With respect to the ESA claim, what Bear Creek is asking this court to do is something that's really quite extraordinary. They want this court to impose a critical habitat analysis framework on a species that doesn't have designated critical habitat. There's no basis in the statute for doing that. And, of course, in the Fund for Animals case, the court stated that it was, that the agency was not required to designate critical habitat. And unless the court has further questions about any of the specific claims that Bear Creek has raised, I think I'd like to stop. I have one further question. There's a footnote in the opinion of our court that previously said that they didn't the issues in respect to consultation because of the way they decided the case. So the consultation issue is still open. And that is raised to some extent in the blue brief where they say that there must be a three-step consultation process undertaken by the project in respect to the species. Now, did any consultation take place with the other agencies? Yes. The Forest Service prepared a biological assessment, as it's required to do under the Endangered Species Act, and engaged in informal consultation with Fish and Wildlife, who concurred in the no jeopardy conclusion in the biological assessment. So there was consultation here. And I would say I can't recall the exact terms of the footnote that you're talking about, but I don't think that any claim was raised in the original suit, as it could have been. Well, the footnote says there was a consultation claim raised, and that they didn't address it because of the reasons that they decided to send it back. So I take it as a given that consultation issues were raised. But I don't think that it was the same consultation issue that they're raising here. It wasn't the argument that the Gifford can show analysis of what the critical habitat analysis should look like. That argument was not made in the first lawsuit. And perhaps if it had been, this Court might have decided that and given the agency some direction and allowed it to address the issue on remand. But I don't think it is appropriate for Bear Creek to be making a new challenge like that here. But even if it had, the agency has engaged in consultation and there's no ‑‑ Well, we don't know exactly what that consultation issue was in the first case. Not from the face of the opinion, no. Unless there are any other further questions. I think not. Thank you. Okay. You're getting me coming and going. If the Forest Service had just issued a supplemental report, then we would have just challenged those things that they supplemented. But they didn't. They redid the whole project. They changed ‑‑ I mean, they redid the whole analysis. They changed a series of things all through the project. And you're asking me what, you know, what didn't they change? What did they change? I know they changed a lot of things, but there's some things they didn't change. For example, the analysis about grizzlies is, yes, we are challenging the determination that may affect, not likely to adversely affect. We're challenging the whole new determination about the grizzlies. We're not just challenging the one thing they did about the addition of adding the sheep allotment. If they had just issued one amended, you know, supplemented information report that had to do with nothing but the sheep allotment, then we'd have challenged that one thing. But they didn't. They issued a whole new finding, a whole new may affect, not likely to adversely affect finding. And so what we're asking the Forest Service to do is say, no, it's got to be more than that. You actually have to show that it's going to benefit the recovery, your new determination about grizzly bears. What's your authority on the benefit issue? The benefit issue is asking to, because the critical habitat is redundant with recovery zones, we're asking this Court to extend that same protection to recovery zones that critical habitat does. Given that the... But that tells me your argument, not your authority. The authority is Gifford-Pinchot. All right. And the Endangered Species Act itself, which argues for the conservation and survival of the species. The economic argument is something that is new and can be raised, and that is simply that the Forest Service economic analysis here is flawed because it did not include what it determines some costs. However, it's clear that when it says it's empirical, that is included. There are models. That's what models are, is use of empirical data. And it's that those models that the GAO has determined are unreliable. And so the Forest Service uses those models for some figures, not for other figures, and the combination of them results in unreliability. The Forest Service accounts for some costs and others, and I think that by not including all costs, it is arbitrary and capricious to not include all factors in the cost analysis. Thank you. Thank you. Thank both counsel for your arguments. Bear Creek Counsel v. Heath is submitted.
judges: B. Fletcher, McKeown, King